## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

Civil Action No.

LIGIA COLCERIU, and those similarly situated,

Plaintiffs,

v.

JAMIE BARBARY a/k/a JAMIE ENGELHARDT,
ENGELHARDT & CO. LLC,

Defendant.

_____

## COMPLAINT
## AND DEMAND FOR JURY TRIAL

_____

Comes now, above-named Plaintiff, on behalf of herself and those similarly situated, with the following Complaint alleging as follows:

## INTRODUCTORY STATEMENT

1.     In recent years, the internet has been taken by storm by the increased popularity gained by social media. Companies all over the world spend billions of dollars a year on elaborate efforts to establish and maintain a social media presence and acquiring followers and likes.

2.     Even the U.S. State Department was determined to acquire followers and increase its social media presence, having spent $630,000 from

2011 to 2013 to collect Facebook likes (Leslie K. John, 2017)[1].

3.      Both exposure and direct sales are targeted by brands promoting their products on social media.

4.      In the last three years, Instagram (Facebook's platform for photo and video sharing) has become the most popular way to influence consumer behavior on social media. Since 2017, Instagram grew tremendously, adding 100 million users every few months[2].

5.      Being a part of Facebook empire, Instagram recognized that each person can only have a limited number of "friends" and therefore allows users to create profiles that can be "followed" by other users. This way, each user can be "followed" by any number of other users without having to actively accept or acknowledge each follower as would be the case with Facebook "friends." For example, celebrities like Kendall Jenner and Kim Kardashian have over one hundred million followers.

6.      Users with a large number of followers and regularly generate

---

[1]   Leslie K. John, *What's the Value of a Like*, Harvard Business Review, Mar.-Apr., 2017, https://hbr.org/2017/03/whats-the-value-of-a-like (last visited June 17, 2020).

[2]   Farhad Manjoo, *Why Instagram Is Becoming Facebook's Next Facebook* The New York Times, April 26, 2017, https://www.nytimes.com/2017/04/26/technology/why-instagram-is-becoming-facebooks-next-facebook.html (last visited June 17, 2020).

content are called 'influencers' due to their ability to influence consumer behavior. Influencers monetize their status by charging advertisers a fee to create and place advertisements on their feeds and stories.

7. Facebook, the parent company of Instagram also offers various products for commercial use.

8. For example, an advertiser may promote content using a *boosted post* or an *Instagram ad* for a price paid directly to Facebook. Both the *post* and the *ad* are created by the advertiser that wants to promote a certain message, service, or product.

9. Same advertisers can promote content by paying influencers to create a collaboration post. Influencers can also be paid for ads to be posted on the influencer's account, as part of the *feed* (the pictures and videos displayed for an user when accessing or refreshing an account) or as part of *stories* (short videos that only show for a limited amount of time and, usually, can only be viewed once).

10. Another way Instagram is allowing advertisers to use the platform is by sponsoring independent content generated by influencers themselves. In this case the influencer should take advantage of the "paid partnership" tag offered by Instagram which is one step on maintaining

compliance with the Federal Trade Commission's ("FTC") rules and guidelines.

11.    "There are many factors that determine the rate an influencer charges for their work." Most pricing starts with the following baseline formula as stated by Katie Sehl on the popular social media management platform Hootsuite[3] and goes up from there: <u>$100 x 10,000 followers + extras = total rate</u>.

12.    The FTC has repeatedly published guidelines for influencers regarding proper advertising practices, the latest material being printed in 2019 and attached in *Exhibit 1*.

13.    Since the number of followers has a direct determination on the amount a sponsor is willing to pay for content and partnerships, most influencers spend considerable time and effort trying to gain as many followers as possible. "Increased followers translate to increased potential to raise your rates and drive commissionable sales" state the Defendants on their website.

14.    While there are many factors that would attract followers to an

---

[3] Katie Sehl, *The basic formula for calculating fair Instagram influencer rates,* Hootsuite Blog, Mar. 4, 2019, https://blog.hootsuite.com/instagram-influencer-rates  (last visited June 17, 2020).

account, having an aesthetically pleasing feed, good content, and audience engagement are considered ways of organically growing an Instagram following.

15.     While most "influencers" use legitimate and legal methods of gaining followers, not all users or "influencers" on Instagram are honorable or operating within the confines of the law much less these guidelines in gaining followers.

16.     Some "influencers" however are using giveaways, "follow for follow" schemes, purchasing likes, or other similar "black hat" methods, that are both illegal and a violation of Instagram policies[4], to artificially increase the number of followers to their account.

17.     Some unscrupulous "influencers" even make it a habit of posting fake reviews for sponsored products or fail to disclose the fact that they were paid in order to create content displayed on their profile.

18.     The Defendants in this lawsuit use yet another unscrupulous method whereby they run illegal lotteries and advise "influencers" to lie in

---

[4] "Creators and publishers can only monetize content consumed by their natural, authentic audience. This means creators and publishers may not engage in any behavior that artificially boosts views or engagement." Instagram Terms and Conditions, https://help.instagram.com/ 116947042301556. (last visited May 22, 2020).

order to convince Instagram users to take part in their games of chance.

19.     Specifically, the Defendants use cash prizes as incentives and run these so called "cash giveaways" by asking users to like a plethora of unrelated accounts in order to enter in a game of chance and win prizes with a total value of $5,000 or more.

20.     Defendant Jamie Barbary collects money from hundreds of Instagram profile holders looking to artificially increase the numbers of their followers. The cost one "follower" ranges between $0.35 for the *Starter* package and $0.40 for the *Growth* package. See *Exhibit 2*, an excerpt from Defendants' website.

21.     The named Plaintiff and thousands of similarly situated individuals participate in these games of chance to without receiving any basic information like the odds of winning, how and when the drawing is done, who provides the prize, etc.

22.     Invariable, even after following hundreds of unrelated profiles and having their accounts invaded by strangers that the Plaintiffs would not have followed other than to participate in the Defendants' giveaway, the Plaintiffs are not winning anything, while Defendants stand to make hundreds of thousands of dollars from perpetuating this scheme.

## NATURE OF THE ACTION

23.    In this action, the named Plaintiff and those similarly situated seek damages, declaratory judgment, permanent injunctive relief, disgorgement of ill-gotten monies, attorney's fees and costs, and other relief from the Defendants, JAMIE BARBARY a/k/a JAMIE ENGELHARDT and ENGELHARDT & CO LLC, for operating an illegal lottery, unjust enrichment, fraud, misrepresentation, violations of the FTC Act, 15 U.S.C. § 45(a), and violations of Florida Unfair and Deceptive Practices Act.

## PARTIES

24.    The named Plaintiff, LIGIA COLCERIU ("Colceriu"), is a citizen of Florida who resides in Pinellas County, FL and is otherwise *sui juris*.

25.    Colceriu entered the Defendants' lottery in Florida and her story is typical for thousands of people that participated in the Defendants' illegal giveaways.

26.    Defendant JAMIE BARBARY a/k/a JAMIE ENGELHARDT ("Barbary") is a citizen of California who resides in San Diego County, California and is otherwise *sui juris*. Barbary is transacting business in Florida over the internet and actively soliciting business in Florida.

27.     Defendant ENGELHARDT & CO. LLC ("Company") is a citizen of California being registered and doing business in San Diego County, California. All its members and directors are California citizens residing in San Diego County, California. The Company is transacting business in Florida over the internet and actively soliciting business in Florida.

28.     The Defendant Barbary is the principal of the Company and at all times material to this Complaint, acting alone or in concert with others, formulated, directed, controlled, had the authority to control, or participated in the acts and practices of the Company, including the acts and practices set forth in this Complaint.

29.     At all material times the Defendants have maintained a substantial course of trade in or affecting commerce.

## JURISDICTION AND VENUE

30.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1337(a) in relation to violations 15 U.S.C. § 45(a).

31.     This Court has jurisdiction over this matter also pursuant to 28 U.S.C. §1332. There is complete diversity between parties and the amount in controversy is in excess of $75,000.

32.   The Court also have supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over the Plaintiffs' related state law claims.

33.   Venue is proper pursuant to 28 U.S.C. § 1391(b)(2). The Defendants are alleged to perpetrate their illegal conduct in Pinellas County, Florida.

## STATEMENT OF FACTS

### I. Background

34.   The Defendants are operating the *thespeakingofstyleblog.com* website as well as *@jbsocialcollective* and *@speakingofstyledaily* Instagram accounts.

35.   As part of her business, Defendant Barbary claims to "provide step-by-step recommendations for working *with* the algorithm and *alongside* your followers to attract and grow an audience."

36.   According to her website, over the course of one year, Defendant Barbary used the tools outlined in her self-published guide to "grow her fashion + lifestyle account (@speakingofstyledaily) to more than 60,000 followers and averages nearly 1,000 likes per post."

37.   An integral part of the process was organizing of lotteries and giveaways where unrelated Instagram users, that would not be

otherwise interested in the content she provides, would follow her account with the hope that they will win a cash prize.

38.    Since the process seemed to be working for Barbary, using JB Social (a nickname for her online presence), she started to propose the giveaway system as a way of getting rich to other influencers on Instagram.

39.    Natasha Pehrson is one of the influencers that benefited from this service. "My engagement has been going up like crazy and a lot of my posts are showing up to over 100k on the explore page! I have grown so many quality followers with JB Social. So grateful I found you!" she states in a testimonial about the incredible results of this fraudulent scheme.

40.    Right now, many other influencers contacted by Barbery are promoting this game of chance, being fully compensated, and without properly disclosing such compensation, making it appear like they are somehow advancing the funds used for the prizes. Such influencers include: Bekah Martinez (@bekah), Tate Dahl (@tatedoll), Tia Booth (@tiarechel91), Jessica Fay (@lipstickheelsnandababy), and many more.

**II. The Value of a follower**

41.    One of the main indicators of social media influence is the number of followers on an Instagram account and it is one of the most important metrics that business and followers use in evaluating an accounts influence.

42.    There are three ways to determine the value of each additional follower added to an Instagram account; the Market Value, the Advertiser's Value, and the Platform Value.

43.    The Market Value of determining a followers' value is directly proportional to the amount charged by Barberry for "supplying" each additional follower. For example, Barberry's Growth Package offers 10,000 new followers for $3,999.00 giving us a follower value of approximately $0.40 per follower. *See* Exhibit 2.

44.    The Advertiser's Value of determining a follower's value is the amount an advertiser would pay for each additional follower on a user's account. Based on the formula in Paragraph 10, the value is of approximately $0.10. More sophisticated software applications, like *SocialBlueBook*, may present a higher and more accurate valuation for each Instagram account.

45.    The Platform Value of determining a followers' value is the amount of money Facebook is charging for each newly acquired follower on

a sponsored Instagram campaign. Based on Facebook's estimate, the value of a follower is at least $1.20, representing the average cost per click charged for sponsored content on Instagram[5].

46.     As alluded to above, the number of followers on an Instagram account is one of the main indicators of the account's social media influence and indicators such as the number of followers are important metrics that businesses use in determining whether to advertise on an account. Individuals also use these indicators to determine whether or not to follow an account or purchase the goods and/or services promoted by or advertised on an account.

47.     Fake followers undermine the influencer economy and erode consumer and business trust in the information provided by otherwise scrupulous influencers.

### III. Barbary and the Company

48.     Given the lack of legal enforcement in the social media field, Barbary decided to take advantage of unscrupulous successful "influencers" and the micro-influencers (niche influencers with a relatively reduced, but loyal, following) that would like to appear bigger than they really are.

---

[5] Christina Newberry, *The basic formula for calculating fair Instagram influencer rates,* Hootsuite Blog, Apr. 13, 2020, https://blog.hootsuite.com/instagram-ads-guide/#cost (last visited June 17, 2020).

49.    And this is how it started: Barbary convinced and paid a few influencers to pretend that they organize a lottery to the benefit of their followers. Of course, none of the influencers mentioned that they are paid or otherwise rewarded by Barbary to set up the lottery.

50.    By directing the influencers to not inform their follower about the compensation and other benefits they receive from Barbary, Barbary was condoning and directing a flagrant violation of the FTC rules.

51.    At the same time Barbary, and later the Company, started selling followers. Specifically, if micro-influencers paid Barbary and the Company the charged rates, the micro-influencers were put on a list of people to follow by participant's influencer audience. At the date the named Plaintiff entered the lottery,  there were 62 people on that list. *See* Exhibit 3.

52.    Barbary is running her illegal lotteries on a recurring basis.

53.    On or about April 2020, Colceriu saw that few of the influencers she follows organized a "giveaway" with total cash prizes of US$ 9,000. *See* Exhibit 4.

54.    In order to participate in said game of chance, Colceriu was required to and indeed did follow all the people she had to follow, all 62 of them.

55.    Little that she knew Barbary received direct cash or other benefits for each person on the list that Colceriu followed.

56.    Each time Colceriu clicked on the "Follow" button for one of the influencers on the list, Colceriu was supposed to gain the chance to win a money prize but instead, Barbary became richer at the expense of Colceriu and thousands of others in her position.

57.    Colceriu was never contacted back with the results of the lottery and she never received any prize.

### III.  The illegal lotteries

58.    To put it succinctly, Barbary is acting a modern-day Joe Cabot[6], bringing together unscrupulous "influencers" looking for a fast payout and micro-influencers looking to artificially increase their profiles.

59.    First, Barbary contacts "influencers" with a sizeable following but also with a history of defying the FTC Rules.

60.    Afterwards, she collects money from micro-influencers and establishes a prize.

---

[6] Joe Cabot is the name of the character played by Lawrence Tierney in the cult classic firm *Reservoir Dogs* who famously brought together various unrelated criminals for a bank heist.

61.     Without disclosing that they are paid to organize and promote said lotteries, the "influencers" advertise these games of chance mainly via Instagram Stories ("Insta-Stories").

62.     By choosing Insta-Stories as their medium of advertising these lotteries, the proof of any involvement on behalf of the influencer in these games is automatically deleted a after a certain period, making enforcement by FTC extremely difficult.

63.     Barbary specifically directed her lotteries to Florida residents as at least one of the "winners" of these illegal lotteries publicly states that she is from Florida.

64.     Also, the lotteries are actively promoted by influencers located in Florida like Jessica Fay (@lipstickheelsandababy).

65.     The Defendants engaged in deceptive and unfair acts in the conduct of their commercial activity in Florida.

66.     Barbary uses her *@jbsocialcollective* account mainly to promote her lotteries and does not post any other valuable content. Therefore, upon belief, all of the followers of her *@jbsocialcollective* account are only following it because they were participants in one of her lotteries as the

*@jbsocialcollective* is always listed as one of the accounts to follow on the list promulgated by Barbary.

67.    For an average cost of $0.40 per follower and judging by the fact that *@jbsocialcollective* account had over 80,000 followers at the time of drafting the Complaint and each one of these 80,000 followers followed the more than 68 "micro-Influencer" profiles included in Barbary's list, the value of this fraud is over $2 million ($2,000,000.00).

68.    This Two Million Dollar valuation is likely understated as Instagram users are free to unfollow any account they wish and as such, the number of Instagram users that participated in these illegal lotteries, and directly enriched Barbary $26.00 ($0.40x65), is likely far in excess of the 80,000 followers that follow the *@jbsocialcollective* account.

## RULE 23 CLASS ALLEGATIONS

69.    The Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein.

70.    The Plaintiffs asserts the counts stated herein as class action claims pursuant to Fed. R. Civ P. 23.

71.     Colceriu's story and her claims are typical for the class and, as the named Plaintiff, Ligia Colceriu is aware of other persons in the same situation.

72.     Colceriu will fairly and adequately protect the interests of the class.

73.     The classes represented by Colceriu has over 80,000 members and joinder of all members is impracticable.

74.     Since the whole class participated in lotteries organized and promoted by the Defendants, the questions of law and fact are common to the class.

75.     As questions of law and fact that are common to class members predominate over any questions affecting only individual members, a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

**COUNT I: OPERATION OF ILLEGAL FLORIDA LOTTERIES**

76.     The Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein. As set forth above, Plaintiffs assert this count on their own behalf and on behalf of all other similarly situated persons pursuant to Fed. R. Civ P. 23.

77.     The Defendants are organizing a lottery in Florida in violation of §§ 849.09, 849.094 Fla. Stat. by promoting and conducting a lottery with total prizes in excess of five $5,000.

78.     Pursuant to § 772.104, Fla. Stat., as the Defendants are in violation of § 849.09, Fla. Stat., each Plaintiff in the class is entitled to minimum damages of $200.00.

79.     The Plaintiffs also requests attorney fees pursuant to § 772.185, Fla. Stat.

## COUNT II: UNJUST ENRICHMENT

80.     The Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein. As set forth above, the named Plaintiff asserts this count on her own behalf and on behalf of all other similarly situated Instagram users.

81.     Instagram users that are members of the class continue to suffer injuries as a result of the Defendants' behaviors. If the Defendants do not compensate the Plaintiffs, they would be unjustly enriched as a result of their unlawful act or practices.

82.     It is an equitable principle that no one should be allowed to profit from his own wrong, therefore it would be inequitable for the Defendants to

retain said benefit, reap unjust enrichment.

83.     Since the Defendants unjustly enriched themselves at the expense of the Instagram users in amounts exceeding $2 million ($2,000,000.00), the Plaintiffs request the disgorgement of these ill-gotten money.

## COUNT III: NEGLIGENT MISSREPRESENTATION

84.     The Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein. As set forth above, the Plaintiff asserts this count on her own behalf and on behalf of all other similarly situated persons pursuant to Fed. R. Civ P. 23.

85.     In convincing the Plaintiffs to participate in cash giveaways, the Defendants made representation that they knew to be false, or negligently failed to examine the veracity of the affirmations.

86.     As a result of Defendants' negligent misrepresentations, the members of the class suffered injury.

## COUNT IV: VIOLATIONS OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

87.     The Plaintiffs incorporate by reference all previous paragraphs of this Complaint as if fully re-written herein. As set forth above, the Plaintiff assert this count on her own behalf and on behalf of all other similarly situated

persons pursuant to Fed. R. Civ P. 23.

88.   For a fee, the Defendants provided Instagram users with the means and instrumentalities for the commission of deceptive acts and practices.

89.   Also, the Defendants engaged in practices that were in violation of § 849.09, Fla. Stat. by promoting and conducting a lottery with total prizes in excess of $5,000.

90.   Therefore, the Defendants' acts and practices constitute deceptive acts or practices in violation of Section 5(a) of 15 U.S.C. § 45(a).

91.   Violations of 5(a) of 15 U.S.C. § 45(a) represent per se violations of the Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA").

92.   The Defendant engaged in a deceptive act or unfair practice, by engaging in fraud and statutory violations.

93.   Such practices as the ones employed by the Defendants are illegal, unethical, unscrupulous, and likely to mislead any consumer acting reasonably in the circumstances, to the class members' detriment.

94.   The Defendant's engagement in these unfair practices caused the Plaintiffs to suffer a loss.

95.   The Plaintiffs also request injunctive relief. Absent injunctive

relief by this Court, the Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the class members.

96.     In the alternative, pursuant to § 501.211(1), Fla. Stat., as the Plaintiffs are aggrieved by the violation of FDUTPA, they are entitled to obtain a declaratory judgment that the Defendants' practice violates the law and to enjoin the defendants as they have violated, are violating, and it is likely to violate the Act in the future.

97.     The Plaintiff also requests attorney fees pursuant to § 501.2105, Fla. Stat.

## DEMAND FOR JURY TRIAL

98.     The Plaintiffs and those similarly situated demand a trial by jury for all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff, LIGIA COLCERIU, respectfully requests that judgment be entered in her favor and in favor of those similarly situated as follows:

a.  Certifying and maintaining this action as a class action, with named Plaintiff as designated class representative and with her counsel appointed as class counsel;

b.  Declaring Defendants in violation of each of the counts set forth above;

c.  Awarding   Plaintiff   and   those   similarly   situated   statutory,
compensatory, punitive and treble damages;

d.  Awarding Plaintiff and those similarly situated liquidated damages;

e.  Order the disgorgement of ill-gotten monies;

f.  Awarding the named Plaintiff, a service award;

g.  Awarding pre-judgment, post-judgment, and statutory interest;

h.  Awarding attorneys' fees;

i.  Awarding costs;

j.  Awarding such other and further relief as the Court may deem just and
proper.

Dated: June 20, 2020

Respectfully Submitted,
*Attorney for the Plaintiffs,*

*/s/ Bogdan Enica*
Bogdan Enica, Esq.
Trial Counsel

FL. Bar No.0101934
66 W Flagler St. Ste.900
Miami FL 33130
Phone: 786-588-4758
Fax: 305-907-5323
E-mail: b.enica@fashion.law