## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

LIGIA COLCERIU, and those
similarly situated,

Plaintiffs,

                                        CASE NO: 8:20-cv-1425-T-35AAS

v.

JAMIE BARBARY and
ENGELHARDT & CO. LLC,

Defendants.

---

## RESPONSE TO MOTION TO DISMISS

---

### Introductory statement

     While perpetuating a scam, the Defendants believed they found the philosopher's stone. In other words, they found something they could use to transform worthless dust into gold. At least this what they are alleging in their Motion to Dismiss, ("MTD") [ECF#24] that while making millions of dollars from their illegal lotteries, there is really no value lost by the participants. Well, as the alchemists all found out, making something from nothing is nothing short of utopic.

     While conflating the two completely different concepts of Instagram Posts with Instagram Profiles, the Defendants stress the apparent banality of the process of "clicking" the "Follow" button. But a "click" is not just the function of depressing the mouse button or a tapping a screen, it is much more than that: products are purchased

with a "click," fortunes are made and transferred with a "click," legally binding documents are filed in court with a "click." Arguably, virtually everything in the modern world can be done with only a "click."

What matters is the not the time and effort expended behind the physical process of a "click." What is far more important is the process by which a person makes the decision to "click" and the results of that "click"[1]. The Plaintiff stated that she was supposed to follow at least 62 unrelated profiles (Complaint ¶54), which means that she was supposed to allow at least 62 strangers to invade her social media stream (Complaint ¶22). Considering that an average Instagram profile provides at least one update daily, we are looking at allegedly 62 "clicks" generating hundreds and thousands of posts in the Plaintiff's feed over the course of just a few weeks.

Personal social networking is a window to the world. As very well stated by the FTC[2], social networking "enables people to stay up to date and share personal content with friends and family, and is an integral part of the daily lives of millions of Americans." Therefore, "personal social networking gives people a personalized social space in which they can share content with their personal connections." *Id.*

The question is: why would a person agree to such an invasion of her

---

[1] Defendants wrongly represent in their motion that Plaintiff "joined the contest by "clicking" on a bunch of Instagram **posts**." (MTD ¶2) [emphasis added]. In fact, the named Plaintiff represented that she had to follow a number of Instagram **profiles** (Complaint ¶22). The Complaint explains what the difference between a post and a profile (Complaint ¶5 - ¶12). [emphasis added]

[2] Complaint in *Federal Trade Commission v. Facebook Inc.*, Case No. 1:20-cv-03590-CRC, U.S District Court, District of Columbia.

personalized social space, allowing 62 strangers share their unrelated pictures and stories in her Instagram feed? The answer is simple: for a chance to win $9,000.00.

The value of the lottery prize was not chosen randomly or based on some external factor; it was chosen carefully by the Defendant Barbary because that is the minimum amount of money for which people would agree to invest the time to follow all the micro-influencers and become subject to such an invasion of their private Instagram account. In fact, Barbary started with smaller prizes, but quickly realized that the value of the prize has to be significant enough to induce Instagram users to participate in her illegal lotteries. In the end, like Alexander Hamilton said describing a lottery: "Every body, almost, can and will be willing to hazard a trifling sum for the chance of a considerable gain.[3]"

Barbary is not organizing free "contests" (as the MTD erroneously suggests repeatedly), but rather lotteries a/k/a "giveaways" which are not free (the word "free" also appears multiple times in MTD) and, more importantly, are not legal.

The MTD also, somehow, conflates influencers (defined in Complaint ¶40), that are paid by Barbary (not by Engelhart Co. Ltd.) to advertise her illegal lotteries, with micro-influencers (defined in Complaint ¶48) that are paying Barbary for an increased number of "followers." [emphasis added]. This is important because, on

---

[3] "Idea Concerning a Lottery, [January 1793]," *Founders Online,* National Archives, https://founders.archives.gov/documents/Hamilton/01-13-02-0291. [Original source: *The Papers of Alexander Hamilton*, vol. 13, *November 1792–February 1793*, ed. Harold C. Syrett. New York: Columbia University Press, 1967, pp. 518–521.]

social media, the number of "followers" and "likes" on someone's page is indicative of its popularity. *Ebersole v. Kline-Perry*, 1:12cv26 (JCC/TRJ), at *13 (E.D. Va. Aug. 29, 2012). By artificially increasing their numbers of "followers", the micro-influencers aim to earn more money from misleading advertisers by artificially inflating the most measurable metric by which a page's popularity can be gauged.

But nowhere on Instagram is the money transfer between the Defendants, influencers, and micro-influencers properly disclosed. Barbary does not mention that she is paid by the micro-influencers and the influencers are not disclosing being paid by Barbary. It took careful investigative work on behalf of the Plaintiff to discover the flow of money, and the Complaint pleads with particularity when, where, how and by whom the scheme is perpetrated and perpetuated.

## Legal Argument

Pursuant to Federal Rule of Civil Procedure 8(a), the Plaintiffs are required only to give a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ.P. (8)(a)(2).

When considering a Motion to Dismiss, the "plaintiff's allegations must be accepted as true and viewed in the light most favorable to the plaintiff." *In re Se. Banking Corp.*, 855 F. Supp. 353, 358 (S.D. Fla. 1994). Under this standard, for a Motion to Dismiss, "the movant sustains a very high burden." *Id.* (citing *Jackam v. Hospital Corporation of America Mideast, Ltd.,* 800 F.2d 1577, 1579 (11th Cir.1986). Indeed, motions to dismiss are viewed with disfavor and are rarely granted. See *Brooks v. Blue Cross & Blue Shield of Florida, Inc.,* 116 F.3d 1364, 1369 (11th Cir. 1997); *Wood*

*v. Cellco P'ship*, 8:06CV687 T27TBM, 2007 WL 917300 (M.D. Fla. 2007).

In our case the "shotgun" MTD does not raise sufficient and appropriate legal challenges to the sufficiency of the Complaint and therefore should be denied.

In the event that the Court grants any part of the Defendants' Motion to Dismiss, the Plaintiff respectfully requests that the Court do so without prejudice, and that the Plaintiff have an opportunity to re-plead. *See* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend a pleading] when justice so requires."). Amendment in this case would not be futile, and Defendants have not and could not point to any other basis on which to deny the Plaintiffs the right to re-plead. "A plaintiff ordinarily should get one opportunity to amend his complaint before dismissal with prejudice." *Emrit v. Sec'y, United States Dep't of Educ.*, No. 20-11429, 2020 U.S. App. LEXIS 31797, at *1 (11th Cir. Oct. 7, 2020).

### Defendant Jamie Barbary

Contrary to the speculations in the MTD, the Complaint doesn't assert at any point that any of the allegations are brought against Barbary in her quality of a principal of Engelhardt & Co. Ltd. ("Company"), or that the Plaintiff intends to pierce the corporate veil. Barbary acted in her personal capacity while perpetrating the scheme and organizing the illegal lotteries. (Complaint ¶38). In fact, the Complaint uses Barbary's name no less than 27 times while *JB Social* (Jamie Barbary Social) is her Instagram handle and a nickname for her own online presence. *Id*.

In fact, the Complaint alleges that both Barbary and the Company are, at times, engaged in this practice alongside each other: "At the same time Barbary, and later the

Company, started selling followers..." (Complaint ¶51). The Complaint is also clear in alleging that Barbary (aside from the Company) is transacting business in Florida over the internet and actively soliciting business in Florida. (Complaint ¶26).

In the end, "[o]ne who is sued in h[er] personal capacity, whether […], an officer or agent of a corporation, may not escape personal liability […] by hiding behind the corporate veil even in those situations where the corporation might also be a proper party to the action." *Chemtall Inc. v. Citi-Chem, Inc.,* 992 F. Supp. 1390, 1392 (S.D. Ga. 1998).

The Complaint is sufficient in pleading each count again each of the defendants, including against Jamie Barbary personally.

### Plaintiffs Have Art. III Standing

The Eleventh Circuit held in *Saladin v. City of Milledgeville*, 812 F.2d 687, 691 (11th Cir. 1987) that standing "can be predicated on non-economic injury, so long as it is a direct, personal injury," citing V*alley Forge College v. Americans United*, 454 U.S. 464, 482 (1982) and *School District of Abington Township v. Schempp,* 374 U.S. 203, 224 n. 9, 83 S.Ct. 1560, 1572 n. 9, 10 L.Ed.2d 844 (1963).

The Defendants treat Article III standing as an injury in fact requirement, which is not the law in this Circuit. "They may overlap but are not synonymous." *In re Brinker Data Incident Litig.*, No. 3:18-cv-686-J-32MCR, at *21 (M.D. Fla. Jan. 27, 2020).

The Defendants cannot rely on the cases they cite in support of their standing defense as those cases involve one single unsolicited message, *Salcedo v. Hanna*, 936

F.3d 1162, 1172 (11th Cir. 2019), one unsolicited voicemail, *Gregorian v. FCS US LLC,* Case No. 19-150265, 2020 WL 7238392, at *2 (11th Cir. Dec 9, 2020), three messages, *Fenwick v. Orthopedic Specialty Institute, PLLC*, Case No. 0:19-cv-62290-Ruiz/Strauss, 2020 WL 913321, at *4 (S.D. Fla. Feb. 4, 2020) (Strauss, M.J.), or five text messages, *Eldridge v. Pet Supermarket Inc.,* 446 F. Supp. 3d 1063 (S.D. Fla. 2020), that inconvenienced the receivers. In *Salcedo*, for example, the Court stated that one text message represented an alleged harm that is "isolated, momentary and ephemeral," *Salcedo*, 936 F.3d at 1171, and compared such action with receiving an "unwanted postcard" or "having a flyer waived in one's face." *Id.*

In our case we are taking about following 62 (sixty-two) Instagram profiles (Complaint ¶¶51, 54) most of them sending at least one daily update. The Plaintiff claims that her Instagram account was "invaded by strangers" as a result of receiving so many unrelated updates. (Complaint ¶52). In this case, we are taking about filling up one's mailbox with at least 62 unwanted postcards, flyers and newspapers every day or having tens or hundreds of flyers waived in one's face every time the person goes for a walk.

Everything more than an "ephemeral" harm gives rise to standing in the Eleventh Circuit. For example, even the "[t]ime spent safely disposing of or keeping the untruncated receipt is, [...] a small injury, [...] it is enough for standing purposes." *Gross v. Concorde, Inc.*, No. 8:18-cv-01755-T-02CPT, at *9 (M.D. Fla. Jan. 29, 2019), quoting *Muransky v. Godiva Chocolatier, Inc.,* 905 F.3d 1200 (11th Cir.2018).

In fact, other cases show that the nature of the harm does not have to be significant in order to confer standing. For example, "sending of **one** fax and resulting occupation of the recipient's telephone line and fax machine" was enough to confrere a plaintiff standing, regardless of the fact that "the fax was actually printed or read." *Palm Beach Golf Center-Boca, Inc. v. Sarris*, 781 F.3d 1245, 1250 (11th Cir. 2015). [emphasis added]. The Supreme Court recognized that a small injury, "an identifiable trifle," is sufficient to confer standing. *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2417 n. 14, 37 L.Ed.2d 254 (1973):

> "The basic idea that comes out in numerous cases is that an identifiable trifle is enough for standing to fight out a question of principle; the trifle is the basis for standing and the principle supplies the motivation."

*United States v. Scrap*, 412 U.S. 669, 690 n.14 (1973)[4]

The essence of an Article III standing question is whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to assure that "concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for the illumination of difficult constitutional questions[.]" *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703 7 L.Ed.2d 663 (1962). citing *Saladin v. City of Milledgeville*, 812 F.2d 687, 690 (11th Cir. 1987); *Harris v. McRae*, 448 U.S. 297, 320

---

[4] The Eleventh Circuit applied this case in *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009).

(1981).

Here, the named Plaintiff, as well as all the other lottery participants, invested the time to follow the 62 micro-influencers and their social media feed was instantly invaded by hundreds of unrelated pictures, videos, "stories," updates, and so on. This is much more than a "trifle." The named Plaintiff has alleged enough of a personal stake in this action as to guarantee adverseness.

Also, despite the harm inflicted on her as described above, the Plaintiff argues that participating in a Florida illegal lottery gives her standing to sue. In other words, "[t]he actual or threatened injury required by Art[icle] III may exist solely by virtue of 'statutes creating legal rights, the invasion of which creates standing." *Palm Beach Golf Center-Boca, Inc. v. Sarris*, 781 F.3d 1245, 1251 (11th Cir. 2015) quoting *Warth v. Seldin, 422 U.S. 500 (1975)* (quoting *Linda R. S.,*410 U.S. at 617 n. 3, 93 S.Ct. at 1148 n. 3).

What is interesting is the Defendants' reliance on *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013) (MTD pg. 9, fn. 3). In that case, the plaintiffs asserted "that they suffer present costs and burdens that are **based on a fear** of surveillance," *Clapper v. Amnesty Int'l USA*, Id. at 416. [emphasis added]. That case is so far away from what the present case sands for. In our case, the damage is real; there is not a fear that 62 strangers will invade Plaintiff's Instagram feed, there is not a fear that Plaintiff may need to participate in a lottery, there is not a fear that Barbary is going to perpetuate a scam where the Defendants, influencers and micro-influencers will alike defy the law, and any written and unwritten rules; these are the actual facts, these fears came to pass

and it happened and continues to happen as the Plaintiff properly alleged it in the Complaint.

### Rule 12(b)(6) and Rule 9(b)

To survive dismissal, under Rule 12(b)(6), a complaint must contain sufficient factual matter, that "accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1049 (2009). Unable to marshal any actual facts to support their motion to dismiss under Rule 12(b)(6), defendants cite the law without applying it to the Complaint in this case. The factual allegations pled in the Complaint are real and plausible. For example, in order for the Plaintiff to be able to properly plead the factual elements of the scam perpetuated by the Defendants, the Plaintiff investigated influencers that are promoting Barbary's lotteries and observed that they had a history or defying the FTC Rules (Complaint ¶59); the Plaintiff also investigated the flow of money and observed that Barbary is paying influencers (Complaint ¶59) and that she is selling followers (Complaint ¶51).

To the extent that the Plaintiff's claims do not sound in fraud, the proper pleading standard for these claims is Rule 8(a). S*ee Kenneth F. Hackett & Assocs. Inc. v. GE Capital Info. Tech Solutions, Inc.*, 744 F. Supp. 2d 1305, 1312 n.7 (S.D. Fla. 2010). Under this pleading standard, the Plaintiff properly states her claims.

Contrary to what is asserted in the MTD, Rule 9(b) does not apply to the Plaintiffs' FDUTPA claim as that claim is predicated on violations of Section 5(a) of 15 U.S.C. § 45(a), the Federal Trade Commission Act ("FTC Act") and it is the

violation of the FTC Act that in of itself constitutes a violation of FDUTPA. *JES Props., Inc. v. USA Equestrian, Inc.*, No. 8:02-cv-1585-T-24MAP, 2003 U.S. Dist. LEXIS 20633, at *1 (M.D. Fla. Oct. 10, 2003).

Since Rule 9(b) does not apply to claims under Section 5 of the FTC Act (*FTC v. Student Aid Ctr., Inc.,* 281 F. Supp. 3d 1324, 1338 (S.D. Fla. 2016)), pleadings asserted under Rule 8(a) are sufficient for the purpose of FTC Act violations and therefore violations of FDUTPA.

The only remaining count that the Defendants argue should conform with the strict requirements imposed by Rule 9(b) is the Negligent Misrepresentation count.

In Florida, a plaintiff may establish a claim for negligent misrepresentation by proving "(1) [a] misrepresentation of a material fact; (2) the representor … ma[d]e the representation without knowledge as to its truth or falsity, or. . . under circumstances in which he ought to have known of its falsity; (3) the representor . . . intend[ed] that the misrepresentation induce another to act on it; (4) injury must result to the party acting in justifiable reliance on the misrepresentation." *Souran v. Travelers Ins. Co.*, 982 F.2d 1497, 1503 (11th Cir. 1993) (alterations in original) (quoting *Hoon v. Pate Constr. Co.*, 607 So. 2d 423, 427 (Fla. Dist. Ct. App. 1992) (per curiam)).

In our case Barbary (1) made representations regarding her lotteries, encouraging people to participate in what she described as "giveaways"; (2) she knew or should have known that her lotteries are illegal; (3) Barbary intended that the Plaintiff and the other participants take part in lotteries; and (4) after justifiable reliance on Defendants' statements Plaintiff suffered injuries. Therefore, the pleadings satisfy

the standard imposed by Rule 9(b) for the purpose of the negligent misrepresentation claim.

### Each count is properly pled

"At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (internal quotation marks omitted)." *Gaylor v. DDR Se. Abernathy, LLC*, Civil Action File No. 1:12-CV-4343-TWT, at *3 (N.D. Ga. Nov. 15, 2013) citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992).

Each count in the Complaint incorporate by reference all previous paragraphs of the Complaint as if fully re-written, while particularly alleging the specifics for each cause of action; therefore, the properly pled facts apply to each Count.

### A. Operation of Illegal Florida Lotteries

The activity violating the statute, the organizing of illegal lotteries, is alleged to be ongoing and similar to and interrelated with Barbary's business practices. Barbary and the Company are organizing illegal lotteries on an ongoing basis (Complaint ¶52), using the same strategy: paying influencers to advertise the lotteries, to the benefit of micro-influencers looking for an artificially increased number of followers. (Complaint ¶58).

In the MTD, the Defendants heavily rely on *Ginsberg v. Lennar Fla. Holdings*, 645 So. 2d 490, 501 (Fla. Dist. Ct. App. 1994). However, their reliance is misplaced as *Ginsberg* is dissimilar to the case at hand. In *Ginsberg,* the Plaintiff failed to plead the

elements of theft, or any other underlying crime, in order to access the Florida Civil Remedies for Criminal Practices Act, § 772.103(3), Florida Statutes. In that case, the court found that "the Act simply cannot apply where there has been no criminal activity." *Ginsberg*, 645 So. 2d at 501. Here, not only does the Complaint specifically alleges that the lotteries are illegal (Complaint ¶¶16, 18, 23, 25, 33, 52, 63, 68), it also specifically alleges the violation of a criminal statute (Complaint ¶77).

While the Defendants rely on *Nat. Answers, Inc. v. Smithkline Beecham Corp.*, No. 04-22646-CIV-UNGARO-BENAGES, 2005 U.S. Dist. LEXIS 54559 (S.D. Fla. Feb. 4, 2005) for the proposition that criminal intent has to be properly asserted, that case is a trademark case, where the party using the trademark was doing so without intending to copy or otherwise confuse consumers. See also *Nat. Answers, Inc. v. SmithKline Beecham Corp.*, 529 F.3d 1325 (11th Cir. 2008). In our case, Barbary is organizing illegal lotteries being fully aware of the implications. She is a "modern-day Joe Cabot," who brings together "various unrelated criminals" for organizing illegal lotteries. (Complaint ¶58, fn.6).

While not necessary to prove a claim under § 772.104, Fla. Stat., the Complaint pleads that Barbary and the Company are associated in fact in order to continuously organize illegal lotteries.

As explained above, Jamie Barbary is sued in her personal capacity and her ownership stake in the Company is irrelevant for liability purposes. The Complaint states that she started organizing the lotteries and involved the Company at a later

stage in order to aid her in her criminal conduct. (Complaint ¶51).

The Defendants also rely on *Bambu v. E.I. Dupont De Nemours Co*, 881 So. 2d 565, 575 (Fla. Dist. Ct. App. 2004) when arguing that the statute does not impose liability on either of the Defendants as they cannot be considered an enterprise.

In *Bambu*, unlike here, there was no claim that any person separate from the corporation acted in her personal capacity. In fact, in that case, the plaintiff tried to argue that an association takes place between the corporate entity and her litigation lawyers "carrying on the regular affairs of the defendant." *Bambu*, 881 So. 2d at 575. As explained in *Bambu*, a person can be a separate entity from the enterprise as long as she conducts business in her own name. This is exactly the case here. Barberry is alleged to conduct business in her own name (Complaint ¶66) and associates with Company in order to organize the illegal lottery (Complaint ¶51).

Also, regarding allegations of at least two incidents, the Complaint states: "During the course of one year, Defendant Barbary used the tools outlined in her self-published guide [...] to more than 60,000 followers and averages nearly 1,000 likes per post." (Complaint ¶36). This highlights the size of the criminal enterprise and highlights the fact that Defendants are organizing numerous illegal lotteries over the course of a year. The conduct is ongoing (Complaint ¶36), and Barbary continues, as of now, to organise illegal lotteries.

### A. Unjust Enrichment

In their MTD, while requesting that the other counts of the Complaint be dismissed, the Defendants argue that a claim for Unjust Enrichment is barred by the

existence of the other claims. (MTD pg.16). However, both federal and Florida law,

permit pleading in the alternative, which may result in inconsistent pleadings.

"A party may state as many separate claims or defenses as it has, regardless of

consistency." Fed. R. Civ. P. 8(d)(3). See also *ThunderWave, Inc. v. Carnival Corp.*, 954

F. Supp. 1562 (S.D.Fla.1997). The same is true under Florida law: "A party may also

state as many separate claims or defenses as that party has, regardless of consistency

and whether based on legal or equitable grounds or both." Fla. R. Civ. P. 1.110. See

also *Innovative Material Sys., Inc. v. Santa Rosa Utilities, Inc.*, 721 So.2d 1233 (Fla. 1st

DCA 1998).

The Defendants allege that Plaintiff did not confer a benefit to them. The word

"benefit," denotes "any form of advantage" conferred upon a party and is not limited

to a direct pecuniary benefit. Restat. 1st of Restitution, § 1. See also *Legends Collision*

*Ctr., LLC v. State Farm Mut. Auto. Ins. Co.*, No. 6:14-cv-6006-Orl-31TBS, 2016 U.S.

Dist. LEXIS 178129 (M.D. Fla. Apr. 29, 2016). As the Complaint properly alleges,

the Defendants received an average of $0.40 for each micro-influencer that the Plaintiff

followed. (Complaint ¶67).

The Defendants also argue that the benefit conferred to them was not "direct"

and rely on *Kopel v. Kopel*, 117 So. 3d 1147 (Fla. Dist. Ct. App. 2013) and *Extraordinary*

*Title Services, LLC v. Florida Power & Light Co.*, 1 So. 3d 400 (Fla. Dist. Ct. App. 2009).

Nothing in these two cases resemble the case at hand.

In *Kopel*, defendant paid a third party (his father) $2,917,200 of a $5 million loan.

None of the plaintiffs in that case received any part of this money from the father. See.

*Kopel v. Kopel,* 117 So. 3d at 1152. Therefore, unlike in the case at hand, the plaintiffs in *Kopel* did not receive any benefit.

In *Extraordinary Title Services,* the complaint indicated that the plaintiff had absolutely no relationship with the defendant and had not conferred a direct benefit upon the defendant. The defendant in question was an independent contractor of FPL ("the Group") who did not receive any of the money paid by the plaintiff to FPL. "Plaintiff contracted with FPL, not Group, for electricity; Plaintiff paid FPL, not Group; and Group provided no services to Plaintiff." *Extraordinary Title Services, LLC v. Florida Power & Light Co.*, at 404. In both examples, the money went to a third party that was different than the defendants in those cases. More important, in both cases, the third party kept the money and did not pay the defendants.

Here, the money flowed to the Defendants. In fact, millions of dollars unjustly enriched both Barbary and the Company as a direct result of the Plaintiff's actions. The Plaintiff "contracted" with Barbary, and at her instruction, followed the required profiles that were listed on Barbary's Instagram page. Barbary promised the Plaintiff that in exchange for her efforts and inconvenience she will be entered in a lottery. Barbary claimed to have organized the lottery that the Plaintiff did not win. As a direct result of Plaintiff's actions, for each profile that the Plaintiff followed, Barbary "received direct cash or other benefits" (Complaint ¶55). It is the Defendants that are directly cashing in on the benefit of the Plaintiff's actions and the benefit conferred by the Plaintiff to the Defendants is direct and significant. (Complaint at ¶¶56, 67). Also, the Plaintiff's injuries are not "remote," but directly related to Defendant's' conduct.

**B. Violations of Florida's Deceptive and Unfair Trade Practices Act**

"An unfair practice is 'one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *PNR, Inc. v. Beacon Prop. Mgmt., Inc.,* 842 So. 2d 773, 777 (Fla. 2003) (quoting *Samuels v. King Motor Co. of Ft. Lauderdale*, 782 So. 2d 489, 499 (Fla. 4th DCA 2001)).

Pursuant to Fla. Stat. § 501.203, a *per se* violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") is established by the violation of any rule promulgated pursuant to the FTC Act, and by the violation of any statute, rule, or regulation proscribing unfair or deceptive practices. Here, the Defendants are violating FTC regulations and Florida law by organizing illegal lotteries and failing to disclose paid advertising. In determining whether an act is an unfair trade practice, "due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to [§] 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. [§] 45(a)(1). § 501.204, Fla. Stat. (2018)." *In re Brinker Data Incident Litig.*, No. 3:18-cv-686-J-32MCR, at *32 (M.D. Fla. Jan. 27, 2020).

"Because Plaintiffs allege that [defendant] violated the FTC Act by providing inadequate security for customer data, they have alleged an unfair practice." *Id.*

In our case, the Plaintiff alleged that the Defendants are not disclosing being paid to run the lotteries and are also advising influencers not to disclose that are being paid. This is an alleged violation of the FTC Act and is therefore a proper pleading regarding an unfair practice under FDUTPA.

Defendants also argue that damages are not properly pled in the Complaint. However, Florida case law recognizes that damages need not be calculated with exact precision, damages calculations must still be based on adequate data. See *Slip-N-Slide Records, Inc. v. TVT Records, LLC*, No. 05-21113-CIV, 2007 WL 3232274, at *11-12 (S.D. Fla. 2007) (citing *Christopher Advert. Grp., Inc. v. R & B Holding Co. Inc.*, 883 So. 2d 867, 871 (Fla. 3d DCA 2004)) (law does not contemplate that damages must be calculated with mathematical exactness); see also *G.M. Brod & Co., Inc. v. U.S. Home Corp.*, 759 F.2d 1526, 1538 (11th Cir. 1985) (proof of damages may be indirect and based upon assumptions […] as long as the assumptions rest on adequate data).

In fact, the risk of uncertainty in calculating damages, like it may be the case here, "falls on the wrongdoer." *See Slip-N-Slide Records, Inc.*, 2007 WL 3232274, at *36 (citing *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931))." *ME Tech. v. Brownstein*, No. 20-61508-Civ-Dimitrouleas/Snow, at *11 (S.D. Fla. Nov. 13, 2020).

The Complaint in this case plausibly allege a violation of the FTC rules, and it also plausibly alleges that the violation caused damages, therefore this count is properly asserted.

Also, the Complaint allege a violation of § 849.094 Fla. Stat. "by promoting and conducting a lottery with total prizes in excess of five $5,000." (Complaint ¶77). Statutes may be found to serve as predicates for a FDUTPA claim under § 501.203(3)(c), Fla. Stat. in one of two ways. First, the text of a statute may expressly state that it is to serve as a FDUTPA predicate *Parr v. Maesbury Homes, Inc.*, No. 6:09-

cv-1268-Orl-19GJK, 2009 U.S. Dist. LEXIS 119087, at *24 (M.D. Fla. Dec. 22, 2009). This is exactly the case here since the above-mentioned statute states: "A violation of this section or soliciting another to commit an act that violates this section, constitutes a deceptive and unfair trade practice actionable under the Florida Deceptive and Unfair Trade Practices Act. A violation of this section or soliciting another to commit an act that violates this section, constitutes a deceptive and unfair trade practice actionable under the Florida Deceptive and Unfair Trade Practices Act." § 849.094(11), Fla. Stat. Defendants seem to completely ignore this subsection of § 849.094, Fla. Stat., in their MTD.

In the alternative, "anyone aggrieved by violation of FDUTPA may bring an action to obtain a declaratory judgment that an act or practice violates this part" § 501.211 Fla. Stat. As used in this section, the term "aggrieved or adversely affected party" means "any person […] that will suffer an adverse effect to a protected interest." *Ahearn v. Mayo Clinic,* 180 So. 3d 165, 173 (Fla. Dist. Ct. App. 2015).

So, regardless of "whether an aggrieved party can recover "actual damages" under § 501.211(2), it may obtain injunctive relief under § 501.211(1). *See Del Monte Fresh Produce Co. v. Dole Food Co., Inc.*, 136 F. Supp. 2d 1271, 1292-93 (S.D. Fla. 2001) (finding, under prior version, that while [Plaintiff] could not recover monetary damages under FDUTPA, it could obtain [**9] declaratory and/or injunctive relief); *Big Tomato v. Tasty Concepts, Inc.*, 972 F. Supp. 662, 664 (S.D. Fla. 1997)." *Wyndham Vacation Resorts, Inc. v. Timeshares Direct, Inc.,* 123 So. 3d 1149, 1152 (Fla. Dist. Ct. App. 2012).

As such, even if, at the summary judgment stage, the Court concludes that damages are not adequate for a FDUTPA claim, the Complaint properly pleads enough facts to survive dismissal.

### C.   Negligent Misrepresentation

The Defendants, again, claim that this count should be dismiss as no sufficient harm was inflicted to the Plaintiff. However, Florida defines damages in negligence cases as only "some actual harm." *Am. Optical Corp. v. Spiewak*, 73 So. 3d 120, 127 (Fla. 2011) (quoting *Williams v. Davis*, 974 So. 2d 1052, 1056 (Fla. 2007)" *In re Brinker Data Incident Litig.*, No. 3:18-cv-686-J-32MCR, at *21 (M.D. Fla. Jan. 27, 2020).

While addressing the issue of injury, the Defendants are relying on *Prohias v. Pfizer, Inc.*, 485 F. Supp. 2d 1329 (S.D. Fla. 2007), case that applied New Jersey law. Since this Court has jurisdiction through diversity of citizenship, it "is bound to apply the substantive law of the state in which it is located." *Shapiro v. Associated Int'l Ins. Co.*, 899 F.2d 1116, 1118 (11th Cir. 1990), therefore this Court should it should apply Florida law to the case at hand. While arguably a persuasive precedent, *Prohias* has no direct applicability to this case. Therefore, their argument fell short of being persuasive.

### CONCLUSION

For the foregoing reasons, the Defendants' Motions to Dismiss should be denied in its entirety. To the extent that the Court grants dismissal of one or more claims, such dismissal should be without prejudice and the Plaintiffs should be given leave to re-plead.

Dated January 15th, 2021.

Respectfully Submitted,

/s/ Bogdan Enica
Bogdan Enica, Esq.
*Attorney for the Plaintiffs*
66 W Flagler St. Ste.900, Miami FL 33130
Phone: 786-588-4758
E-mail: b.enica@fashion.law

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on the 15th day of January 2021, I have caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system which sends notification of such filing to all counsel of record.

s/<u>*Bogdan Enica*</u>
Bogdan Enica, Esq.
