## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

LIGIA COLCERIU, and those
similarly situated,
Plaintiffs,                                     CASE NO: 8:20-cv-1425-T-35AAS

v.

JAMIE BARBARY and
ENGELHARDT & CO. LLC,
Defendants.

---

## RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT

---

### Preliminary matters

"Instead of clicking 'unfollow,' the Plaintiff seeks to invoke the jurisdiction of the federal courts to try to state **a federal RICO claim** against a one-person business that she is accusing of criminal conduct." states Defendants' Motion to Dismiss Amended Complaint [ECF No.47] ("Motion"), setting the tone for a misleading and legally flawed motion. In fact, nowhere in the First Amended Complaint [ECF No. 44] ("Complaint"), the Plaintiff tries to state "a federal RICO claim," as emphasized in the Motion. Even if the Defendants are trying to further confuse the Court by entering as an exhibit another case filed by the same Plaintiff, not even in that case is the Plaintiff is trying to state a federal RICO claim.

This case is not about RICO, it is about organizing and promoting illegal lotteries in Florida, by two (not one) California-based defendants.: Jamie Barbary and Engelhardt & Co. LLC.

As for "unfollowing" the accounts, the Complaint states: "Since the rules of the lottery required that she follow of these accounts until the prize is awarded, Colceriu had no choice but see how her Instagram feed is taken over […]" (Complaint ¶66). As such, in the context of this case, the Plaintiff could not have participated in the lottery if she unfollowed the accounts she was forced to follow.[1]

The Defendants also raise a doubtful argument in favor of their Motion, stating that "giveaways" are "widely-popular" and "played by millions on Instagram," without quoting any source. (Motion at 4). Buying followers is against the Instagram's own terms and the simple fact that such schemes may have gained some popularity is not an indication of their legitimacy or legality. Increasing the number of followers and boosting engagement should take place in an organic way, by promoting personalized content, encouraging user generated content, responding to comments, embracing authenticity, etc. *See 6 Ways to Boost Your Content Engagement in 2021*, PIXLEE, https://www.pixlee.com/blog/6-ways-to-boost-your-content-engagement-in-2021 (last visited August 1, 2021). Paying for followers, and sponsoring giveaways where uninterested users follow your account just to win a prize, did not make the list.

Throughout the Motion, Defendants misrepresent the nature of the illegal lotteries by calling them "free giveaways." The term "free" is used no less than sixteen times through the Motion. But there is nothing free about the "giveaways." According

---

[1] It is true that the Plaintiff could have elected not to take advantage of the remedies afforded by law. However, having chosen to exercise her legal rights in order to remediate a wrong, not make the defendant or her counsel evil or ill indented.

to Florida law, these so-called "free giveaways" are in fact illegal lotteries.

In Florida, a lottery has three elements: a prize, an award by chance, and a consideration. *Little River Theatre Corp. v. State ex rel. Hodge*, 135 Fla. 854, 185 So. 855 (1939). While the Defendants do not contest the existence of a prize being awarded by chance, they are trying to imply in their Motion that there was no consideration for the lottery since no money was paid to enter the lottery. This is not the law. To the contrary, in order to constitute a lottery, pecuniary consideration is not necessary and consideration necessary to establish simple contract is sufficient. *Blackburn v. Ippolito*, 156 So. 2d 550 (Fla. Dist. Ct. App. 1963).

"The detriment which will constitute a consideration for a promise need not be an actual loss to the promisee. It is sufficient if he does something that he is not legally bound to do." *Mangus v. Present,* 135 So. 2d 417 (1961). See also *Lake Sarasota, Inc. v. Pan Am. Sur. Co.*, 140 So.2d 139, 142 (Fla. 2d DCA 1962), *In re Standard Jury Instructions—Contract & Business Cases,* 116 So. 3d 284, 305 (Fla. 2013). In our case, the Plaintiff had to follow sixty-two accounts that she would have not follow other than to participate in the lottery. (Complaint ¶26).

"The consideration required to support a simple contract need not be money or anything having a monetary value, but consist of *either* a benefit to the promisor *or* a detriment to the promisee." *Little River Theatre Corp. v. State,* 135 Fla. 854, 185 So. 855 (1939). (emphasis added). In our case, it is undisputed that the Defendants hugely benefitted by the fact that the Plaintiff and those similarly situated entered in their "giveaways," as the Defendants "made hundreds of thousands of dollars perpetuating

this scheme." (Complaint ¶26). Thus the Plaintiff have shown both a benefit to the promisor and the detriment to the promisee.

Florida added the above definition of the lottery in its Standard Jury Instructions for Criminal Cases in 2015: "Regarding the lottery instructions, i.e., 22.5, 22.6, 22.7, 22.8, 22.9, 22.10, and 22.11, a citation to the case that sets out the three elements defining "lottery," *Little River Theatre Corp. v. State,* 135 Fla. 854, 185 So. 855 (1939), is added. In addition, the definition of "lottery" is simplified to only include the three elements already set out in the instructions. *In re Standard Jury Instructions in Crim. Cases-Rep. No. 2014-08*, 176 So. 3d 938, 939 (Fla. 2015)

According to the current jury instructions, a "lottery" has three elements: (1) consideration - that is, a bet or thing ventured; (2) a prize; and (3) the award or winning of the prize by lot or chance. *Id.*

A "thing ventured" is when something other than money or property is risked by a participant on the outcome of a game, contest, or uncertain or contingent event, with the expectation of gaining or losing as a result, which includes but is not limited to the time, inconvenience, and effort required to attend or participate. *In re Standard Jury Instructions in Crim. Cases* - Rep. No. 2014-08, 176 So. 3d 938, 961 (Fla. 2015).

Our Plaintiff could have followed accounts that she liked, or use her time in a way that would have benefitted her, but, as mentioned in the Complaint, she followed all those accounts "only to participate in defendant's lotteries, not because she found anything particularly of interest in those accounts." (Complaint ¶64).

Therefore, under Florida law, the so called "free giveaways" are falling squarely

into the definition of lotteries.

Another red herring present throughout the Motion is the word "voluntarily." Indeed, the Defendants are using the term "voluntary" no less than thirty-one times in their Motion defining Instagram as a "voluntary platform" that Plaintiff "voluntarily uses to receive messages from accounts she voluntarily follows." (Motion at 3, 11). In order to check her social media Plaintiff "voluntarily signs in to an Instagram platform that she voluntarily joined." (Motion at 12). The Defendants are qualifying every single action that Plaintiff took by adding the word "voluntarily" in front of it. While this Court correctly observed the participation in the lotteries was voluntary, the Defendants failed to articulate *any* valid argument on why the voluntary nature of the act is legally significant.

Miriam Webster Dictionary defines "voluntary" as "done or brought about of one's own will. Voluntary implies freedom and spontaneity of choice or action without external compulsion." Miriam Webster Dictionary Online, https://www.merriam-webster.com/dictionary/voluntary. (last visited August 1, 2021).

In our case, the actions were taken by Plaintiffs with external compulsion or motivation. Indeed, Plaintiff wanted to participate in a giveaway, being unaware that it is actually an illegal lottery. But in order to do that she had to allow over sixty accounts to have access to her data and her feed. And the sixty accounts were selected and imposed on Plaintiff by no other than the Defendants.

It is not like the Plaintiff browsed Instagram and she saw sixty accounts that she liked and desired to follow. It is not like the Defendants provided a number of accounts

and instructed the Plaintiff to follow the ones she like. No, the Plaintiff **had** to follow the specific accounts that paid Defendant, no matter if it was a CBD store, a tabaco seller, or a quasi-pornographic channel.

So, while she entered the lotteries believing them to be legit giveaways, Plaintiff got the short end of the sick when she found out that she actually allowed advertisers that she did not want to interact with to post content on her Instagram feed.

Another fact that Defendants are blatantly misrepresenting is that "Plaintiff alleges that Engelhardt & Co.'s website **plainly** disclosed that "influencers" whose profiles she clicked to "follow" were charged to grow their audience through giveaways with high-profile influencers." (emphasis added) (Motion at 5, FN3). This is simply not true. The Exhibit 2 of the Complaint can be found at the address: www.thespeakingofstyleblog.com/product/growth-package-10k-new-followers. This link is not even available from the main site managed by Defendants. *See* www.thespeakingofstyleblog.com (last visited August 1, 2021), where there are mainly posts about fashion, TV shows, and Amazon shopping.

The Plaintiff visited Defendants' Instagram profile and profiles of the influencers promoting the lotteries. (Complaint ¶62). Nowhere in the Complaint it is alleged that Plaintiff left Instagram and ventured on the web in order to further look at Defendants' websites that were aimed to micro-influencers and not to lottery participants. Nowhere on Instagram is the money transfer between the Defendants, influencers, and micro-influencers properly disclosed. Barbary does not mention that she is paid by the micro-influencers and the influencers are not disclosing being paid

by Barbary. (Complaint ¶57). In preparation for this lawsuit, it took careful investigative work on behalf of the Plaintiff to discover the flow of money, so the Complaint could plead with particularity when, where, how and by whom the scheme is perpetrated and perpetuated.

Another major flaw in the Motion to Dismiss is the argument that allegations of wasted time, voluntarily expended *do not* establish a concrete injury. (Motion at 9.) This is incorrect. Specifically, allegations of wasted time *can state* a concrete harm for standing purposes. *Salcedo v. Hanna*, 936 F.3d 1162 (11th Cir. 2019) (emphasis added). "There is no minimum quantitative limit required to show injury; rather, the focus is on the qualitative nature of the injury, regardless of how small the injury may be." (*Id.* at 3).

The *Salcedo* Court also noted that wasted time *can* create a concrete injury to establish standing, but that precedent strongly suggests that "concrete harm from wasted time requires, at the very least, more than a few seconds." *Id.* at 1173.  See also *Teblum v. Physician Compassionate Care*, No. 2:19-CV-403-SPC-MRM, 2020 WL 10502588, at *5 (M.D. Fla. Mar. 26, 2020). In our case, the Plaintiff expended a great amount of time to enter the lottery, to research the accounts of lottery promoters, to find who had won the lottery, how and when the prize was awarded. (Complaint ¶¶48, 62, 70).

Throughout the Motion, Defendants are often trying to confuse the Court by choosing to ignore the statements in the Complaint and argue as such statements would not exist. For instance, the Motion reads: The Plaintiff "fails to draw any link

between the mere receipt of an unwanted message on a public social media platform and **any conduct by Defendants**," (Motion at 11) ignoring, for example, the following paragraph: Because of her participation in the Defendant's lotteries, Colceriu's account started to become the target of unsolicited direct messages and in-feed posts (Complaint ¶67). This is just one of many flawed arguments present in the Motion.

### Standard on Motion to Dismiss

Pursuant to Fed. R. Civ.P. 8(a)(2), the Plaintiffs are required only to give a "short and plain statement of the claim showing that the pleader is entitled to relief."

When considering a Motion to Dismiss, the "plaintiff's allegations must be accepted as true and viewed in the light most favorable to the plaintiff." *In re Se. Banking Corp.*, 855 F. Supp. 353, 358 (S.D. Fla. 1994). Under this standard, for a Motion to Dismiss, "the movant sustains a very high burden." *Id.* (citing *Jackam v. Hospital Corporation of America Mideast, Ltd.,* 800 F.2d 1577, 1579 (11th Cir.1986). Indeed, motions to dismiss are viewed with disfavor and are rarely granted. See *Brooks v. Blue Cross & Blue Shield of Florida, Inc.,* 116 F.3d 1364, 1369 (11th Cir. 1997); *Wood v. Cellco P'ship*, 8:06CV687 T27TBM, 2007 WL 917300 (M.D. Fla. 2007).

In our case the "shotgun" Motion[2] does not raise sufficient and appropriate legal challenges to the sufficiency of the Complaint and therefore should be denied.

### Defendant Jamie Barbary a/k/a Ms. Engelhardt

---

[2] In their Motion the Defendants are trying to make reference to a previously filed document: "Prior Motion to Dismiss" (Motion at 4) and "Initial MTD" (Motion at 18, 19, 23). To the extent the Court will consider the arguments in the Motion to Dismiss [ECF #24], the Plaintiff would like the Court to consider the Plaintiff's response [ECF #27].

Contrary to the speculations in the Motion, the Complaint doesn't assert at any point that any of the allegations are brought against defendant Barbary (confusingly referred to in the Motion as "Ms. Engelhardt.") in her quality of a principal of Engelhardt & Co. Ltd. ("Company"), or that the Plaintiff intends to pierce the corporate veil. Barbary acted in her personal capacity while perpetrating the scheme and organizing the illegal lotteries. (Complaint ¶45). In fact, the Complaint uses Barbary's name no less than twenty-seven times and states that *JB Social* (Jamie Barbary Social) and Blush Influence are nicknames for her own online presence. *Id.*

Indeed, as the Complaint clearly states, the Company was only registered later, after Barbary started and perfected the lottery system. (Complaint ¶59).

The Complaint actually alleges that both Barbary and the Company are, at times, engaged in this practice alongside each other: "At the same time Barbary, and later the Company, started selling followers..." *Id*. The Complaint is also clear in alleging that Barbary (aside from the Company) is transacting business in Florida over the internet and actively soliciting business in Florida. (Complaint ¶33).

In the end, "[o]ne who is sued in h[er] personal capacity, whether [...], an officer or agent of a corporation, may not escape personal liability [...] by hiding behind the corporate veil even in those situations where the corporation might also be a proper party to the action." *Chemtall Inc. v. Citi-Chem, Inc.,* 992 F. Supp. 1390, 1392 (S.D. Ga. 1998). Therefore, the Complaint is sufficient in pleading each count again Jamie Barbary (referred to as Ms. Engelhardt) personally.

### Plaintiffs Have Art. III Standing

The Eleventh Circuit held in *Saladin v. City of Milledgeville*, 812 F.2d 687, 691 (11th Cir. 1987) that standing "can be predicated on non-economic injury, so long as it is a direct, personal injury," citing V*alley Forge College v. Americans United*, 454 U.S. 464, 482 (1982) and *School District of Abington Township v. Schempp,* 374 U.S. 203, 224 n. 9, 83 S.Ct. 1560, 1572 n. 9, 10 L.Ed.2d 844 (1963).

The Defendants cannot rely on the cases they cite in support of their standing defense as those cases involve one single unsolicited message, *Salcedo v. Hanna*, 936 F.3d 1162, 1172 (11th Cir. 2019), one unsolicited voicemail, *Gregorian v. FCS US LLC,* Case No. 19-150265, 2020 WL 7238392, at *2 (11th Cir. Dec 9, 2020), three messages, *Fenwick v. Orthopedic Specialty Institute, PLLC*, Case No. 0:19-cv-62290-Ruiz/Strauss, 2020 WL 913321, at *4 (S.D. Fla. Feb. 4, 2020) (Strauss, M.J.), or five text messages, *Eldridge v. Pet Supermarket Inc.,* 446 F. Supp. 3d 1063 (S.D. Fla. 2020), that inconvenienced the receivers. In *Salcedo*, for example, the Court stated that **one** text message represented an alleged harm that is "isolated, momentary and ephemeral," *Salcedo*, 936 F.3d at 1171, and compared such action with receiving an "unwanted postcard" or "having a flyer waived in one's face." *Id.*

In our case we are taking about following sixty-two Instagram profiles (Complaint ¶¶59, 64, 65) most of them sending at least one daily update. The Plaintiff claims that her Instagram account was "invaded" by strangers as a result of receiving so many unrelated updates. (Complaint ¶¶26, 27, 29). In this case, we are taking about filling up one's mailbox with at least sixty-two unwanted postcards, flyers and

newspapers every day or having tens or hundreds of flyers waived in one's face every time the person goes for a walk, which is not short of hounding.

Everything more than an "ephemeral" harm gives rise to standing in the Eleventh Circuit. For example, even the "[t]ime spent safely disposing of or keeping the untruncated receipt is, […] a small injury, […] it is enough for standing purposes." *Gross v. Concorde, Inc.*, No. 8:18-cv-01755-T-02CPT, at *9 (M.D. Fla. Jan. 29, 2019), quoting *Muransky v. Godiva Chocolatier, Inc.,* 905 F.3d 1200 (11th Cir.2018).

In fact, other cases show that the nature of the harm does not have to be significant in order to confer standing. For example, "sending of **one** fax and resulting occupation of the recipient's telephone line and fax machine" was enough to confrere a plaintiff standing, regardless of the fact that "the fax was actually printed or read." *Palm Beach Golf Center-Boca, Inc. v. Sarris*, 781 F.3d 1245, 1250 (11th Cir. 2015). (emphasis added). The Supreme Court recognized that even a small injury, is sufficient to confer standing. *United States v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 412 U.S. 669, 689 n. 14, 93 S.Ct. 2405, 2417 n. 14, 37 L.Ed.2d 254 (1973): "The basic idea that comes out in numerous cases is that an identifiable trifle is enough for standing to fight out a question of principle; the trifle is the basis for standing and the principle supplies the motivation." *Id* at 690 n.14. *See also Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1351 (11th Cir. 2009).

The essence of an Article III standing question is whether the plaintiff has alleged such a personal stake in the outcome of the controversy as to assure that

"concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for the illumination of difficult questions[.]" *Baker v. Carr*, 369 U.S. 186, 204, 82 S.Ct. 691, 703 7 L.Ed.2d 663 (1962). citing *Saladin v. City of Milledgeville*, 812 F.2d 687, 690 (11th Cir. 1987); *Harris v. McRae*, 448 U.S. 297, 320 (1981).

The U.S. Supreme Court gave us a simple example in order to appreciate how the Article III "concrete harm" principle operates in practice by considering two different hypothetical plaintiffs:

> Suppose first that a Maine citizen's land is polluted by a nearby factory. She sues the company, alleging that it violated a federal environmental law and damaged her property. Suppose also that a second plaintiff in Hawaii files a federal lawsuit alleging that the same company in Maine violated that same environmental law by polluting land in Maine. The violation did not personally harm the plaintiff in Hawaii.

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2205 (2021).

In our case we can also consider two different types of potential plaintiffs. One is an Instagram user who saw the "giveaways" being promoted by her favorite influencer(s). The post was displayed on her device for a few seconds and she had to scroll or swipe in order to get to the next post. The second type of plaintiff is our Plaintiff in this case. She saw the post, she clicked (or tapped) on it, she was transferred to the defendant's profile where she read the instructions, followed the instructions, researched the profile of other lottery promoters, and allowed over sixty strangers to start posting on her feed. (Complaint ¶¶59, 70).

Both Plaintiffs encountered illegal lotteries, but, in the first case, the harm was de minimis, "a brief, inconsequential, annoyance," like a "flyer waived in the user's

face." (see *Salcedo*, 936 F.3d at 1171). This Instagram user had only to swipe up in order to avoid any harm to be inflicted on her by the illegal lottery, and this type of injury may not a valid basis for invoking the jurisdiction of the federal courts. The same answer is probably true even if this user encountered a couple of influencers advertising the said lottery.

Same as in the example given in *TransUnion* case, the second plaintiff, suffered an injury-in-fact, not only because she had to expense her time to join the lottery, to monitor the account for results, and ultimately to deal with hundreds of unwanted posts in her feed, but also she had to see her privacy invaded by all these accounts posting unrelated and unwanted content. (Complaint ¶¶26, 27, 29, 67).

As recognised by the Supreme Court, "Article III standing doctrine sharply distinguishes between those two scenarios." *TransUnion*, 141 S. Ct. 2190, 2206 (2021).

Personal social networking is a window to the world and enables people to stay up to date and share personal content with friends and family. Personal social networking, like Instagram, gives people a personalized social space in which they can share content with their personal connections. (Complaint ¶28). But this space was "invaded" by unruly advertisers hounding the Plaintiff with persistent messages. (Complaint ¶27). This is much more than a "trifle," and guarantees adverseness.

The other cases cited by Defendants: *Mgmt. Props., LLC v. Town of Redington Shores, Fla.*, 2021 WL 1530889, *Valley Nat'l Bank v. Warren*, 2021 WL 1597960, and *Keim v. South Fla. Fair and Palm Beach Cty.*, 2021 WL 1588819, are very dissimilar to the case at hand and are mostly dealing with nominal damages.

In *Salcedo*, the Court was particularly concerned about the harm created by an invasion of privacy. *See Salcedo*, 936 F.3d at 1167, 1171. Here, the invasion is unquestionable, hundreds of posts started to appear on Plaintiff's personalized social space, some of them highly offensive, and most of them unwanted. (Complaint ¶27). Plaintiff's data was not shared as generic, aggregated data, but personalized and individual. As here, one's privacy is invaded only when messages or calls are repeated with such persistence and frequency as to amount to hounding. *See Restatement (Second) of Torts* § 652B (1977).

### Rule 12(b)(6) and Rule 9(b)

To survive dismissal, under Rule 12(b)(6), a complaint must contain sufficient factual matter, that "accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1049 (2009). Unable to marshal any actual facts to support their motion to dismiss under Rule 12(b)(6), defendants cite the law without applying it to the Complaint in this case. The factual allegations pled in the Complaint are real and plausible..

To the extent that the Plaintiff's claims do not sound in fraud, the proper pleading standard for these claims is Rule 8(a). S*ee Kenneth F. Hackett & Assocs. Inc. v. GE Capital Info. Tech Solutions, Inc.*, 744 F. Supp. 2d 1305, 1312 n.7 (S.D. Fla. 2010). Under this pleading standard, the Plaintiff properly states her claims.

Contrary to what is asserted in the Motion, Rule 9(b) does not apply to the Plaintiffs' FDUTPA claim as that claim is predicated on violations of Section 5(a) of

15 U.S.C. § 45(a), the Federal Trade Commission Act ("FTC Act") and it is the violation of the FTC Act that in of itself constitutes a violation of FDUTPA. *JES Props., Inc. v. USA Equestrian, Inc.*, No. 8:02-cv-1585-T-24MAP, 2003 U.S. Dist. LEXIS 20633, at *1 (M.D. Fla. Oct. 10, 2003).

### Each count is properly pled

"At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 561 (internal quotation marks omitted)." *Gaylor v. DDR Se. Abernathy, LLC*, Civil Action File No. 1:12-CV-4343-TWT, at *3 (N.D. Ga. Nov. 15, 2013) citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992).

Each count in the Complaint incorporate by reference all previous paragraphs of the Complaint as if fully re-written, while particularly alleging the specifics for each cause of action; therefore, the properly pled facts apply to each Count.

### Two Counts alleging Operation of Illegal Florida Lotteries

The activity violating the statute, the organizing of illegal lotteries, is alleged to be ongoing and similar to and interrelated with Barbary's business practices. Barbary and the Company are organizing illegal lotteries on recurring basis, at least twice a month in a well-established and predictable pattern (Complaint ¶96), using the same strategy: paying influencers to advertise the lotteries, to the benefit of micro-influencers looking for an artificially increased number of followers. (Complaint ¶¶23, 71).

In their Motion, the Defendants heavily rely on *Ginsberg v. Lennar Fla. Holdings*,

645 So. 2d 490, 501 (Fla. Dist. Ct. App. 1994). However, their reliance is misplaced as *Ginsberg* is dissimilar to the case at hand. In *Ginsberg,* the Plaintiff failed to plead the elements of theft, or any other underlying crime, in order to access the Florida Civil Remedies for Criminal Practices Act, § 772.103(3), Florida Statutes. In that case, the court found that "the Act simply cannot apply where there has been no criminal activity." *Ginsberg*, 645 So. 2d at 501. Here, not only does the Complaint specifically alleges that the lotteries are illegal (Complaint ¶¶19, 21, 30, 32, 42, 60, 76, 81, 95, 106, 114), it also specifically alleges the violation of a criminal statute.  Barbary is organizing illegal lotteries being fully aware of the implications. She is a "modern-day Joe Cabot," who brings together "various unrelated criminals" for organizing illegal lotteries (Complaint ¶71, fn.8), and is acting with intent (Complaint ¶¶29, 96).

The Defendants also misplaced their argument in cases dealing with Florida **RICO statute**, affirming that, somehow, Section 772.103 Fla. Stat. is Florida Racketeer Influenced and Corrupt Organizations Act. (Motion at 14-18). They are wrong. Sections 895.01-895.06 (and not § 772.103) are known as the 'Florida RICO (Racketeer Influenced and Corrupt Organization) Act.' § 895.01 Fla. Stat.

The Defendants missed the mark, and this is evident from the reading of the cases they cite. A reading of *Palmas Y Bambu, S.A. v. E.I. Dupont De Nemours & Co., Inc.*, 881 So. 2d 565 (Fla. 3d DCA 2004), cited at pgs. 15, 16, and 17 of the Motion, would show that the court in that case is analysing allegations under § 895 and not § 772:

> The pertinent section of the statute to be construed states: "It is unlawful for any person […] to conduct or participate, directly or indirectly, in such enterprise through a pattern of racketeering activity or the

collection of an unlawful debt." *§ 895.03(3),* Fla. Stat. (1985).   The issue before us is whether, within the meaning of section *895.03(3),* the defendant can be both the "person" and the "enterprise."   [We are b]asing our decision on the clear language of section *895.03(3)* and on a series of cases which construe that same language in the federal RICO.

*Palmas Y Bambu, S.A.* 881 So. 2d 565, 570 (Fla. 3d DCA 2004) (emphasis added).

Therefore, all the Defendants' arguments based on the RICO caselaw should not be considered by the Court as they are irrelevant to this case.

While not necessary to prove a claim under § 772.104, Fla. Stat., the Complaint pleads that Barbary and the Company are associated in fact in order to continuously organize illegal lotteries. As explained above, Barbary is sued in her personal capacity and her ownership stake in the Company is irrelevant here. The Complaint states that she started organizing the lotteries and involved the Company at a later stage in order to aid her. Barberry is alleged to conduct business in her own name (Complaint ¶57) and associates with Company in order to organize the illegal lottery (Complaint ¶59).

Also, regarding allegations of at least two incidents, the Complaint states that Barbary is organizing lotteries on a recurring basis, at least twice a month in a well-established […] pattern, intending all along to commit these acts.  (Complaint ¶96).

### Unjust Enrichment

The Motion states that Plaintiff "has not alleged that she lacks an adequate remedy at law and, to the contrary, has brought other claims at law based on the same […] conduct. (Motion at 18). However, "[a] party may state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3). See also *ThunderWave, Inc. v. Carnival Corp.*, 954 F. Supp. 1562 (S.D.Fla.1997).

Also, the Motion claims that "Plaintiff has not alleged that she conferred a direct benefit on Defendants." (Motion at 18). As the Complaint properly alleges, the Defendants received an average of $0.40 for each micro-influencer that the Plaintiff followed. (Complaint ¶¶23, 51, 80, 81).

Here, the money flowed to the Defendants. It is the Defendants that are directly cashing in on the benefit of the Plaintiff's actions and the benefit conferred by the Plaintiff to the Defendants is direct and significant. *Id*. Also, the Plaintiff's injuries are not "remote," but directly related to Defendant's' conduct.

**Negligent Misrepresentation**

The Defendants, again, claim that this count should be dismiss as no sufficient harm was inflicted to the Plaintiff. However, Florida defines damages in negligence cases as only "some actual harm." *Am. Optical Corp. v. Spiewak*, 73 So. 3d 120, 127 (Fla. 2011) (quoting *Williams v. Davis*, 974 So. 2d 1052, 1056 (Fla. 2007).

In Florida, a plaintiff may establish a claim for negligent misrepresentation by applying four factors. *Souran v. Travelers Ins. Co.*, 982 F.2d 1497, 1503 (11th Cir. 1993)

In our case Barbary (1) made representations regarding her lotteries, encouraging people to participate in what she described as "giveaways"; (2) she knew or should have known that her lotteries are illegal; (3) Barbary intended that the Plaintiff and the other participants take part in lotteries; and (4) after justifiable reliance on Defendants' statements, after following the instructions provided by Defendants, Plaintiff suffered injuries. Therefore, the pleadings are sufficient for stating a negligent misrepresentation claim.

While addressing the issue of injury, the Defendants are relying on *Prohias v. Pfizer, Inc.*, 485 F. Supp. 2d 1329 (S.D. Fla. 2007), case that applied New Jersey law. While arguably a persuasive precedent, *Prohias* has no direct applicability to this case. Therefore, Defendants' argument falls short of being compelling.

### Violations of Florida's Deceptive and Unfair Trade Practices Act

Pursuant to Fla. Stat. § 501.203, a *per se* violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") is established by the violation of any rule promulgated pursuant to the FTC Act, and by the violation of any statute, rule, or regulation proscribing unfair or deceptive practices. Here, the Defendants are violating FTC regulations and Florida law by organizing illegal lotteries and failing to disclose paid advertising. In determining whether an act is an unfair trade practice, "due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to [§] 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. [§] 45(a)(1). § 501.204, Fla. Stat. (2018)." *In re Brinker Data Incident Litig.*, No. 3:18-cv-686-J-32MCR, at *32 (M.D. Fla. Jan. 27, 2020).

In our case, the Plaintiff alleged that the Defendants are not disclosing being paid to run the lotteries and are also advising influencers not to disclose that are being paid. (Complaint ¶¶47,74). This is an alleged violation of the FTC Act and is therefore a proper pleading regarding an unfair practice under FDUTPA.

Also, the Complaint allege a violation of § 849.094 Fla. Stat. "by promoting and conducting a lottery with total prizes in excess of $5,000." (Complaint ¶91). This Section may serve as predicates for a FDUTPA claim under § 501.203(3)(c) Fla.

Stat. as the text of a statute expressly states that it is to serve as a FDUTPA predicate. *Parr v. Maesbury Homes, Inc.*, No. 6:09-cv-1268-Orl-19GJK, 2009 U.S. Dist. LEXIS 119087, at *24 (M.D. Fla. Dec. 22, 2009). This is exactly the case here since the above-mentioned statute states: "A violation of this section, constitutes a deceptive and unfair trade practice actionable under the [FDUTPA]." § 849.094(11), Fla. Stat.

The Complaint plausibly allege a violation of the FTC rules and § 849.094, Fla. Stat. and it also plausibly alleges that the violation caused damages, therefore this count is properly asserted.

In the alternative, "anyone aggrieved by violation of FDUTPA may bring an action to obtain a declaratory judgment that an act or practice violates this part" § 501.211 Fla. Stat. As used in this section, the term "aggrieved or adversely affected party" means "any person […] that will suffer an adverse effect to a protected interest." *Ahearn v. Mayo Clinic,* 180 So. 3d 165, 173 (Fla. Dist. Ct. App. 2015).

So, regardless of "whether an aggrieved party can recover "actual damages" under § 501.211(2), it may obtain injunctive relief under § 501.211(1)." *See Del Monte Fresh Produce Co. v. Dole Food Co., Inc.*, 136 F. Supp. 2d 1271, 1292-93 (S.D. Fla. 2001).

As such, even if, at the summary judgment stage, the Court concludes that damages are not adequate for a FDUTPA claim, and only a declaratory judgment is appropriate, the Complaint properly pleads enough facts to survive dismissal.

## Conclusion

For the foregoing reasons, the Defendants' Motions to Dismiss should be denied in its entirety.

Dated August 9th, 2021.

Respectfully Submitted,

/s/ Bogdan Enica
Bogdan Enica, Esq.
*Attorney for the Plaintiffs*
66 W Flagler St. Ste.900, Miami FL 33130
Phone: 786-588-4758
E-mail: b.enica@fashion.law

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that on the 9th day of August 2021, I have caused the foregoing to be electronically filed with the Clerk of Court using the CM/ECF system which sends notification of such filing to all counsel of record.

s/*Bogdan Enica*_____
Bogdan Enica, Esq.
